UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 10-24507-CV-WCT

GUSTAVO MORENO, and others
similarly situated,

    Plaintiff(s),

v.

FERRETTI GROUP OF AMERICA, LLC,
f/k/a ALLIED MARINE, LLC, *et al.*,

    Defendant.

_____/

**CONSENT CASE**

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Ferretti Group of America, LLC, f/k/a/ Allied Marine LLC ("Allied Marine['s]") Motion for Summary Judgment. **[DE 39]**. A hearing on this Motion **[DE 39]** was held before the undersigned on May 25, 2012. **[DE 68]**. Upon review of the Motion **[DE 39]**, the Response **[DE 49]**, the Reply **[DE 57]**, the court file, hearing argument from counsel **[DE 68]**, and being otherwise duly advised in the premises, the undersigned makes the following findings.

### Background

Gustavo Moreno ("Plaintiff") filed this action on December 16, 2010, pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201-206 ("FLSA"). **[DE 1]**. The Complaint alleges, *inter alia*, failure to pay overtime wages. (Compl. ¶¶ 7, 17), **[DE 1]**. The named Defendants are: Allied Marine, LLC; Platinum Yacht Collection No. Two, Inc. f/k/a/ Richard Bertram Yachts, Inc. ("Platinum Two"); and Platinum Yacht Collection No. One, Inc. f/k/a/ Allied Marine Group, Inc.

("Platinum One"). **[DE 1, 6, 11]**. A Final Default Judgment was entered against Platinum Two and Platinum One on January 31, 2012. **[DE 62]**. Only Allied Marine, now known as the Ferretti Group of America, LLC ("Ferretti"), has appeared in this litigation.[1]

Plaintiff claims that he worked as a yacht detailer, simultaneously, for all three Defendants (Allied Marine, Platinum Two, and Platinum One) beginning on or about October 1, 2007, until December 12, 2010. (See Compl. ¶13), **[DE1]**. Specifically, Plaintiff claims that he worked an average of sixty (60) hours per week, without receiving overtime wages, from December 1, 2007 through April 15, 2010. Id. ¶16. Defendant, on the other hand, denies the allegations and argues that Plaintiff was not covered under the FLSA until March 29, 2010, when he was hired as a full time employee. **[DE47]**. Prior to that time, from September 11, 2008 through March 29, 2010, Defendant contends that Plaintiff provided yacht detailing services to Defendants as an independent contractor, not as an employee. Defendant now seeks summary judgment on this issue, and particularly, a finding that Plaintiff, as an independent contractor, is not covered by the FLSA.

## Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party moving for summary judgment has the "burden of

---

[1] On September 11, 2008, Allied Marine purchased assets from Platinum Two, Platinum One, and a real estate holding company called ARB Realty, Inc. ("Bertram Companies"). **[DE 39]**. According to Defendant, Allied Marine began its own operations on September 15, 2008.

establishing the absence of a genuine issue of material fact." United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1557 (11th Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1981)). In this connection, "[t]he court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." Id. at 322-23.

## Analysis

The FLSA defines the term "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Further, "[a]n entity 'employs' a person under the FLSA . . . if it 'suffers or permits' an individual to work." Antenor v. D & S Farms, 88 F.3d 929 (11th Cir. 1996). Employment status under the FLSA is a matter of law, and as a remedial statute, the FLSA should be construed broadly. See Antenor, 88 F.3d at 925, 929, 933; see also Berrocal v. Moody Petroleum, Inc., No. 07-22549, 2009 WL 455448, at *5 (S.D. Fla. Feb. 22, 2009). The "characterization for tax purposes and the provision of employee benefits" are not relevant in the context of the FLSA's broad definition of employment. See Harrell v. Diamond A Entm't, Inc., 992 F. Supp. 1343, 1353 (M.D. Fla. 1997). The FLSA does not apply to independent contractors. Murray v. Playmaker Services, LLC, 512 F. Supp. 2d 1273, 1276 (S.D. Fla. 2007).

In this Circuit, the "economic realities test" is used to determine whether a person is an employee or an independent contractor. Antenor, 88 F.3d at 933; see also Aimable v. Long & Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994). In order to determine employment status, the court must "evaluate the economic realities of the individual case by focusing on whether the plaintiff [is] economically dependent on the employer." Escobar v. GCI Media, Inc., No. 08-21956-Civ, 2009 WL

3

1758712, at *2 (S.D. Fla. June 22, 2009). Specifically, "the court must look at the surrounding circumstances of the whole activity and not [at] isolated factors." Id. (citing Goldberg v. Whittaker House Coop., Inc., 366 U.S. 28, 31, 81 S.Ct. 933, 6 L.Ed.2d 100 (1962)). No one factor is determinative of employment status. Rather, the weight given to each factor "depends on the light it sheds on the [alleged employee's] economic dependence," on his alleged employer, and on the facts of the case. Antenor, 88 F.3d at 932.

The economic realities test includes the following six factors: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; [and] (6) the extent to which the service rendered is an integral part of the alleged employer's business. Freund v. Hi-Tech Satellite, Inc., No. 05-14091, 2006 WL 1490154, at *1 (11th Cir. May 31, 2006). Each factor shall be addressed below.

*The nature and degree of the alleged employer's control as to the manner in which the work is to be performed*

Defendant alleges that Plaintiff was free to, and did, perform yacht detailing services outside of Allied Marine. (See Def. Stat. Undisputed Facts ¶ 19), **[DE 41]**. Defendant points to Plaintiff's deposition testimony, wherein Plaintiff states that there was no prohibition as to outside work:

> Q. So you could wash as many [boats] as you wanted to outside the company, correct?
> A. Yes.
> Q. The company didn't tell you you [sic] were not allowed to do it?
> A. No, no, never. I don't remember.

4

(Moreno Dep. 32:25-33:5, Sept. 22, 2011), **[DE 40-5]**.

Defendant further argues that Allied Marine was "free to not use [Plaintiff]'s services and [Plaintiff] was free to not provide services to Allied Marine." (Def. Stat. Undisputed Facts ¶ 19), **[DE 41]**. Susan Brothers, the Human Resources Director at Allied Marine, claims that from 2008 to 2009, Plaintiff was only one of several outside vendors whom Allied Marine employed to detail yachts. Id. ¶ 23. Still, Brothers avers that Defendant used Plaintiff's services regularly because he was a preferred vendor who provided good service. Id. ¶ 17.

By contrast, in his Affidavit, Plaintiff submits that he thought he was a full-time employee and that he could not perform outside work:

> I always considered myself a full time employee, though I was paid on an hourly basis . . . I worked for Allied Marine every day [from September 11, 2008 through March 29, 2010], at a regular schedule, and could not pick and choose which jobs were assigned to me, nor could I decline a job that was assigned to me. If I did, I would have been fired. Additionally, I did not perform any work for any other company.

(Moreno Aff. ¶¶ 17-18), **[DE 50-1]**.

Plaintiff further stated, "I do not know whether or not I would have been able to provide services for anyone else as I never did so and never had time to do so as I worked every day." Id. ¶ 19. Plaintiff concedes, nonetheless, that he detailed one boat, off Allied Marine's premises, at the request of his supervisor. (Moreno Dep. 31:17-32:17), **[DE 40-5]**. Plaintiff's supervisor paid him directly for this job. Id. 31:24-25.

It is important to note that Plaintiff gave his deposition testimony in Spanish, with the assistance of an interpreter. Hence, certain things may have been translated out of context. Here, it is unclear whether he thought he could wash boats for entities or persons outside of Allied Marine.

Id. 32:9-33:19. For example, Plaintiff testified that no one from Allied Marine told him that could not wash boats outside the company, but at the same time, he testified that he did not think he was allowed to wash boats outside of the marina. Id. These matters, no doubt, remain in dispute.

*Plaintiff's opportunity for profit or loss depending on his managerial skill*

The record shows that although Plaintiff was promoted to supervisor in September 2008, his "job responsibilities, direct supervisor, work schedule, rate of pay and manner of pay did not change in any way whatsoever." (Moreno Aff. ¶ 9), **[DE 50-1]**. The record, however, is unclear as to Plaintiff's potential opportunities for profit or loss. Further, the only information available as to Plaintiff's managerial skills is that he oversaw the "work quality of [a] new vendor." (Brothers Decl. ¶ 29, Sept. 26, 2011), **[DE 40-1]**. Accordingly, this factor does not weigh in favor of either party.

*Plaintiff's investment in equipment or materials required or his employment of workers*

Plaintiff's tax returns reveal that he invested in certain materials related to yacht detailing services. (See Def.'s App. Mot. Summ. J. Ex. F, G, H, I), **[DE 40-6; 40-7; 40-8]**. In this connection, Defendant notes that Plaintiff declared that he operated a business that detailed, maintained, and repaired yachts on his income taxes. (See Def. Stat. Undisputed Facts ¶ 27), **[DE 41]**. Specifically, from 2007 to 2010, Plaintiff claimed the following expenses on his tax returns: automobile and cellphone charges, special clothing, tools, and insurance.[2] **[DE 40-6; 40-7; 40-8]**. To this end, Plaintiff took business expense deductions totaling over $70,000. (Hr'g Tr. 10, May 25, 2012), **[DE 70]**. These facts certainly add color to Defendant's Motion.

---

[2] The record shows that Plaintiff had neither benefits, nor sick leave, between September 11, 2008 and March 29, 2010. (See Def.'s Mot. Summ. J.), **[DE 39]**. Taxes, like Social Security and/or Medicare, were also not withheld from Plaintiff's gross pay. (Brothers Decl. ¶ 28), **[DE 40-1]**. In this connection, each year Defendant gave Plaintiff an IRS 1099 form which is meant for independent contractors. Id.

The economic realities test, however, does not seem to consider taxes when determining a person's employment status. See Harrell, 992 F. Supp. at 1353. Thus, Plaintiff's tax returns, and facts related thereto, may not be relevant to his characterization as an employee under the FLSA. Plaintiff's tax returns may, nevertheless, be indirectly helpful in ascertaining the level of his investment in his work. As such, this factor weighs in favor of granting summary judgment.

### Whether the service rendered requires a special skill

Plaintiff suggests that yacht detailing requires no specialized skill. Specifically, Plaintiff testified that he had no prior experience or training in yacht detailing prior to working for Defendant. (Moreno Aff. ¶ 24), **[DE 50-1]**. According to Plaintiff, "while some are better than others at detailing yachts, it does not require [a] 'special skill.'" Id.

By contrast, Defendant submits that yacht detailing is a specialized skill and that Plaintiff was a "preferred vendor" because of his skills and knowledge. (See Brothers Decl. ¶ 19), **[DE 40-1]**. The record shows that detailing yachts can "range in price from several hundred thousand dollars to millions of dollars." Id. at ¶ 26. In this connection, Plaintiff's testimony indicates only that he is familiar with yacht detailing as a general matter.[3] (See Moreno Dep. 52:6-53:13), **[DE 40-5]**. These conflicting facts weigh against granting summary judgment.

### The degree of permanency and duration of the working relationship

Defendant testified that it used yacht detailers mostly on a seasonal basis. (See Brothers Decl. ¶ 23; Brothers Dep. 24:23), **[DE 40-1, 50-2]**. According to Defendant, "there are three times a year when we need a lot more [detailers] than we do in the rest of the times of the year, when we have boat

---

[3] In response to Defendant's questions regarding boat detailing, Plaintiff testified that over time, he had learned about the different types of boats and cleaning products, and although detailing yachts was more complex than washing a car, he had not received formal training. Id.

7

shows and things like that." (Brothers Dep. 25:6-9), **[DE 50-2]**. Prior to March 29, 2010, Plaintiff was simply one of several outside yacht detailing providers that Defendant chose to use. (See Def.'s Stat. Undisputed Facts), **[DE 40-1]**.

Plaintiff, on the other hand, testified that he worked year round for Allied Marine and its related entities from 2007 to 2010, and that only one or two workers left during the low season. (See Moreno Aff. ¶¶ 21-22), **[DE 50-1]**; (Compl. ¶ 3), **[DE 1]**. In his Affidavit, Plaintiff also avers that other yacht detailers work year round for Allied Marine as well. (Moreno Aff. ¶ 21-22), **[DE 50-1]**. In this regard, there does not appear to be much of a difference in the number of detailers between the high and low seasons. Indeed, Plaintiff testified that the yacht detailers "always start preparing the boats like three, four, five months before the boat show." (Moreno Dep. 28:3-5), **[DE 40-5]**. Plaintiff's deposition testimony further suggests that his work schedule was consistent:

> Q. Now, during the high season, did the company have more boat detailers working?
> A. They always have the same people. They don't bring people from the outside, but they all get together because they have several places.
> . . .
> Q. Help me understand. In the high season are there more people washing boats?
> A. They are the same workers. They are the same.

(Moreno Dep. 28:15-28:23), **[DE 40-5]**.

On a related note, Defendant contends that Plaintiff determined his own work schedule based on jobs he had committed to. (See Brothers Dep. 26:8-17), **[DE 50-2]**. Plaintiff refutes this argument, however, and suggests he had little control over his hours: "I had to work on Christmas, December 31st . . . [n]ot many people work on December 31st, but I had to work . . . [i]f I didn't work, they wouldn't pay me." (Moreno Dep. 38:13-16), **[DE 40-5]**.

8

In the Court's view, the issue of Plaintiff's control over his schedule and degree of permanency under Defendant clearly remains in dispute.

*The extent to which the service rendered is an integral part of the alleged employer's business*

Defendant argues that this factor weighs in favor of finding that Plaintiff was an independent contractor, as yacht detailing is not an integral part of Allied Marine's main business, i.e., selling yachts. **[DE 40-1]**. This argument is flawed. Although the record shows that Defendant does not provide yacht detailing services to customers directly, Defendant detailed its yachts before they were sold. (See Brothers Dep. 38:17-18), **[DE 50-2]**. Selling these boats was a "substantial part" of Defendant's regular business as a yacht dealer. Id. 17:10-18:5. As noted above, yacht detailers began preparing the boats months before a boat show. (See Moreno Dep. 28:3-5), **[DE 40-5]**. From 2008 to 2010, at least two workers cleaned Defendant's yachts on a regular basis. (See Brothers Dep. 16:20-17:14), **[DE 50-2]**. In sum, this does not appear to be a situation where Plaintiff occasionally provided a non-revenue generating or non-integral service. Accordingly, this factor likewise weighs in Plaintiff's favor.

## Conclusion

Upon careful consideration of the Motion **[DE 39]**, the Response **[DE 49]**, the Reply **[DE 57]**, the relevant authority, hearing argument from counsel **[DE 68]**, and being otherwise duly advised in the premises, the undersigned finds that summary judgment is inappropriate.[4] In this Court's view,

---

[4] As noted above, and as a collateral matter, Defendant seeks a summary judgment finding that Plaintiff did not work for Allied Marine before September 11, 2008 because Allied Marine was not yet operational. **[DE 39]**. In response, Plaintiff suggests that successor liability has not been adequately addressed, and that Defendant has not shown as a matter of law that it is not liable for wages Plaintiff earned prior to September 11, 2008. **[DE 49]**. Having determined that summary judgment is inappropriate, there is no need to address the successor liability issues for present purposes.

many material facts remain in dispute, *inter alia*, Plaintiff's employment status, i.e., employee or independent contractor.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

Defendant Allied Marine's Motion for Summary Judgment **[DE 39]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25 day of July 2012.

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc: Counsel of Record